# Exhibit "B"

```
 1              UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF CALIFORNIA
 3                    WESTERN DIVISION
 4
 5   THE CHUCK OLSEN CO., INC., a  )
 6   California corporation,        )
 7                 Plaintiff,       )
 8            vs.                   ) Case No.
 9   F.P.D., INC., a California    ) CV13-05062-DMG
10   corporation; and JOSEPH        )
11   BALCOM, an individual,        )
12                 Defendants.      )
13   AND RELATED CROSS-ACTIONS.    )
14   _____
15
16               DEPOSITION OF JOSEPH BALCOM
17                  Los Angeles, California
18                 Wednesday, June 11, 2014
19                        Volume I
20
21
22   Reported by:
23   WENDY S. SCHREIBER, CSR No. 3558
24   Job No. 1875735
25   PAGES 1 - 184
```

**CERTIFIED TRANSCRIPT**

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3                      WESTERN DIVISION
 4
 5   THE CHUCK OLSEN CO., INC., a  )
 6   California corporation,       )
 7                  Plaintiff,     )
 8                  vs.            ) Case No.
 9   F.P.D., INC., a California    ) CV13-05062-DMG
10   corporation; and JOSEPH       )
11   BALCOM, an individual,        )
12                  Defendants.    )
13   AND RELATED CROSS-ACTIONS.    )
14   _____
15
16
17       Deposition of JOSEPH BALCOM, Volume 1,
18   taken at 707 Wilshire Boulevard, Suite 3500,
19   Los Angeles, California, commencing at 10:28 A.M.,
20   Wednesday, June 11, 2014, and ending at 3:32 P.M.,
21   before WENDY S. SCHREIBER, Certified Shorthand
22   Reporter No. 3558.
23
24
25
```

Page 2

```
 1        A.    I have a copy of that somewhere, yes.
 2        Q.    And --
 3        A.    Whether it was an e-mail or a letter, I'm
 4   not 100 percent certain.
 5        Q.    It was sent by Olsen as opposed to Perez?
 6        A.    It was written by Olsen, yes.
 7        Q.    And as you sit here today, if you can
 8   recall, was it sent to just you or just FPD or was
 9   it sent to a host of people?
10        A.    I don't know.  I don't recall.
11        Q.    The second thing you mentioned was a call
12   from the Blue Book.  And you received the call from
13   the Blue Book?
14        A.    I did.
15        Q.    And Blue Book was telling you that somebody
16   at the Chuck Olsen Company had made a comment that
17   you were in default to the Blue Book?  Did they tell
18   you who?
19        A.    They did not say who.  They said, "Chuck
20   Olsen is claiming that you're defaulting on an
21   enormous sum or something and we're concerned.
22   We're calling your office and nobody is answering.
23   What's going on?"
24              I said, "Nothing is going on.  I'm in
25   Washington buying cherries."
```

Page 168

```
 1            And they said, "Okay, unless you give us
 2   some information to let us know immediately what's
 3   going on, we're going to pull your rating."
 4        Q.   Did they pull your rating?
 5        A.   They did not.  I had to provide them
 6   additional information.  We responded.
 7        Q.   Has your rating changed since Mr. Olsen or
 8   somebody at the Chuck Olsen Company contacted the
 9   Blue Book?
10        A.   It has not changed.
11        Q.   When they said Chuck Olsen called, did you
12   take that to mean the company or did you take that
13   to mean the individual?
14        A.   I took it to mean the company.  It could
15   have been anyone.  I didn't ask specifically.
16        Q.   Have you done anything since that time to
17   determine who contacted the Blue Book on behalf of
18   the Chuck Olsen Company?
19             MR. DiVINCENZO:  Other than what his
20   attorneys told him?
21             MR. CURTIS:  Yeah, I don't want to know
22   that.
23             THE WITNESS:  That's all.
24        Q.   Now, the suppliers.  You mentioned one
25   supplier, Tanimura & Antle.  They -- what did they
```

Page 169

```
 1   I've contacted has said anything further but I
 2   haven't talked to -- I've only talked to maybe
 3   5 percent of our suppliers since this thing started
 4   so I don't know.  In the course of business I really
 5   haven't had any reason to contact them.
 6       Q.   Do you believe FPD has been damaged by
 7   things that Olsen or Perez have said to third
 8   parties?
 9            MR. DiVINCENZO:  That calls for a legal
10   conclusion.
11   BY MR. CURTIS:
12       Q.   You can answer.
13       A.   Yes.
14       Q.   And how have you been damaged?
15       A.   I think my reputation has been soured up
16   there in the San Joaquin.
17       Q.   And do you have -- have you had a drop-off
18   in revenue as a result of this soured reputation?
19       A.   It's difficult to quantify yet but
20   potentially.
21       Q.   What facts do you have as you sit here today
22   that would lead you to believe although difficult to
23   quantify that there's potentially damage to you?
24            MR. DiVINCENZO:  That's a Rifkind problem.
25   It's a contention interrogatory to state all facts
```

Page 174

```
 1   in a deposition.  It's improper for a lay witness.
 2   BY MR. CURTIS:
 3       Q.   You can answer it.  If there are facts that
 4   you know, you can answer.
 5            MR. DiVINCENZO:  It also calls for a legal
 6   conclusion for him to put together facts that
 7   support a particular theory.
 8            MR. CURTIS:  He can still answer.
 9            THE WITNESS:  In the -- in the course of a
10   conversation in my business if I feel from the
11   supplier that there's a reason why they're not
12   willing to give me product or they suddenly are
13   concerned about payment terms where they hadn't been
14   prior to, it causes concern.  Unfortunately it's not
15   that easy just to say to them, "Is this because of
16   the Olsen thing?" I don't also want to be promoting
17   any potential problems because of this thing, I
18   mean, if there's any damage to my reputation so all
19   I can do is respond to what comes to me in a
20   concrete way.
21       Q.   How many conversations over the last year
22   have you had with suppliers where suppliers suddenly
23   became concerned about payment terms where they
24   weren't before?
25       A.   Or mysteriously --
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1        Q.   Let's take them each individually, otherwise
 2   your attorney would object as compound.
 3        A.   Suppliers in general?  Or, I mean,
 4   specifically from the San Joaquin?
 5        Q.   In general.  You said during the course of
 6   several conversations there were suppliers that
 7   suddenly became concerned about payment terms where
 8   they weren't concerned before.  I want to know how
 9   many times that's happened in the last year.
10        A.   Let's put it this way.  I've only -- I've
11   only attempted to purchase fruit from one person in
12   the last year in California and they raised the
13   concern.
14        Q.   Who is that?
15        A.   Flavor Tree.
16        Q.   And what commodity?
17        A.   Cherries.
18        Q.   And where are they located?
19        A.   They are in Tulare I believe it is or
20   Stockton maybe.  Stockton cherries.  They have two
21   locations but, anyways.
22        Q.   And when you were in this conversation with
23   Flavor Tree, did you ultimately consummate a deal
24   where you bought fruit?
25        A.   I did and I paid them in seven days.
```

Page 176

```
 1      A.   I have a copy of that somewhere, yes.
 2      Q.   And --
 3      A.   Whether it was an e-mail or a letter, I'm
 4  not 100 percent certain.
 5      Q.   It was sent by Olsen as opposed to Perez?
 6      A.   It was written by Olsen, yes.
 7      Q.   And as you sit here today, if you can
 8  recall, was it sent to just you or just FPD or was
 9  it sent to a host of people?
10      A.   I don't know. I don't recall.
11      Q.   The second thing you mentioned was a call
12  from the Blue Book. And you received the call from
13  the Blue Book?
14      A.   I did.
15      Q.   And Blue Book was telling you that somebody
16  at the Chuck Olsen Company had made a comment that
17  you were in default to the Blue Book? Did they tell
18  you who?
19      A.   They did not say who. They said, "Chuck
20  Olsen is claiming that you're defaulting on an
21  enormous sum or something and we're concerned.
22  We're calling your office and nobody is answering.
23  What's going on?"
24           I said, "Nothing is going on. I'm in
25  Washington buying cherries."
```

Page 168

```
 1              And they said, "Okay, unless you give us
 2   some information to let us know immediately what's
 3   going on, we're going to pull your rating."
 4        Q.    Did they pull your rating?
 5        A.    They did not.  I had to provide them
 6   additional information.  We responded.
 7        Q.    Has your rating changed since Mr. Olsen or
 8   somebody at the Chuck Olsen Company contacted the
 9   Blue Book?
10        A.    It has not changed.
11        Q.    When they said Chuck Olsen called, did you
12   take that to mean the company or did you take that
13   to mean the individual?
14        A.    I took it to mean the company.  It could
15   have been anyone.  I didn't ask specifically.
16        Q.    Have you done anything since that time to
17   determine who contacted the Blue Book on behalf of
18   the Chuck Olsen Company?
19              MR. DiVINCENZO:  Other than what his
20   attorneys told him?
21              MR. CURTIS:  Yeah, I don't want to know
22   that.
23              THE WITNESS:  That's all.
24        Q.    Now, the suppliers.  You mentioned one
25   supplier, Tanimura & Antle.  They -- what did they
```

```
 1            I, the undersigned, a Certified Shorthand
 2  Reporter of the State of California, do hereby
 3  certify:
 4            That the foregoing proceedings were taken
 5  before me at the time and place herein set forth;
 6  that any witnesses in the foregoing proceedings,
 7  prior to testifying, were administered an oath; that
 8  a record of the proceedings was made by me using
 9  machine shorthand which was thereafter transcribed
10  under my direction; that the foregoing transcript is
11  a true record of the testimony given.
12            Further, that if the foregoing pertains to
13  the original transcript of a deposition in a Federal
14  Case, before completion of the proceedings, review
15  of the transcript [X] was [ ] was not requested.
16            I further certify I am neither financially
17  interested in the action nor a relative or employee
18  of any attorney or any party to this action.
19            IN WITNESS WHEREOF, I have this date
20  subscribed my name.
21
22  Dated:  June 16, 2014
23
24            _____
25            WENDY S. SCHREIBER, CSR No. 3558, RPR
```

Page 184